UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRYAN BRUMFIELD,

           Plaintiff,

  v.

CITY OF OAKLAND, OAKLAND FIRE DEPARTMENT, FIRE CHIEF GERALD SIMON, and DOES 1-100,

           Defendants.
_____/

No. C 04-1862 MHP

**MEMORANDUM AND ORDER**
**Motion for Summary Judgment**

Plaintiff Ryan Brumfield brought this action in state court against defendants City of Oakland (the "City"), Oakland Fire Department (the "Department") and Fire Chief Gerald Simon ("Chief Simon") alleging discrimination and retaliation on the basis of his speech and his disability. On May 11, 2004 defendants removed this action to federal court. Now before the court is defendants' motion for summary judgment on the grounds that plaintiff cannot sustain his allegations of violations of the First Amendment, 42 U.S.C. section 1983, Fair Employment and Housing Act ("FEHA"), as well as a conspiracy claim and punitive damages claims.

BACKGROUND[1]

The parties agree on the following. Plaintiff Ryan Brumfield has served as a firefighter with the City since December of 1991. Plaintiff also served as an officer of the Oakland Black Firefighters Association (the "OBFFA") for a total of eight years, twice serving as the president of

1 the organization.

2       On or about February 2002 a number of race-based incidents occurred at the Department,
3 including the sending of hate mail to Chief Simon and other members of the Department.[2] Simon
4 Dep. at 32:7–22, 35:22-25, Exh. I. As president of the OBFFA, plaintiff met regularly with the other
5 members of OBFFA to discuss topics including the status of an investigation into the distribution of
6 these offending postcards. Brumfield Dep. at 21:5–17. On March 7, 2002 Chief Simon addressed
7 the members of the OBFFA and stated that an investigation into the identify of the sender of the
8 postcards was underway. Simon Dep. at 61:4–25. The individual(s) responsible for the postcard
9 distribution was never discovered. Id. at 42:15–19.

10       Meanwhile, during late 2001 and early 2002, the Department instituted a personnel action
11 against the plaintiff as a result of his failure to complete 500-600 reports for which he was
12 responsible. After several warnings, plaintiff still failed to complete the reports and neglected to
13 respond to the memos calling his attention to these failures. Towner Dep. at 52:15–53:21; 55:7–16;
14 Towner Dec. ¶¶ 3–8. On January 5, 2002 plaintiff was informed that his supervisor would be
15 recommending disciplinary action against him for insubordination. Towner Dec. ¶ 8.

16       On April 8, 2002 plaintiff called in sick. Towner Dec. ¶ 11. On April 17, 2002 plaintiff
17 called his supervisor Captain Abram and stated that he would be unable to attend work that day.
18 Plaintiff did not provide any indication of when he would expect to return to work. Brumfield Dep.
19 at 35:25–36:5; 36:20–37:22. On April 20, 2002, plaintiff again failed to report to work. Id. at
20 38:4–12. This time, plaintiff did not inform or provide an explanation for his absence to any
21 individual at the Department. Towner Dec ¶ 17. For a period of approximately one month,
22 Department representatives attempted to contact plaintiff, leaving him numerous messages on his
23 answering machine. Plaintiff never returned any of these calls. Towner Dec. ¶¶ 12–16.

24       On May 3, 15 and 17, 2002, the individual in charge of handling sick leave and industrial
25 injury matters for the Department, Steve Danziger, received faxes of "Industrial Injury Visit
26 Verification" forms from Kaiser Permanente in Roseville, indicating that the plaintiff had been
27 examined for a possible work- related injury and would not be able to return to work. Each
28

successive fax from Kaiser extended the time when plaintiff would expect to return to work, culminating in an expected date of return of September 2, 2002. Danziger Dec. ¶¶ 2–7.

During the same time period, plaintiff was experiencing some financial difficulties. Plaintiff stopped making payments on his mortgage in January 2002, and foreclosure proceedings were initiated against him on May 14, 2002. Brumfield Dep., Exh. 5 at 3:13–27. The foreclosure sale was initially scheduled to be held on September 10, 2002 but was postponed by the filing of a Chapter 7 bankruptcy petition. Id., Exh. 4. Ultimately, plaintiff lost his home, his vehicle and many of his possessions.

On May 4, 2002, plaintiff heard rumors that Chief Simon was considering terminating him for job abandonment. Brumfield Dep. at 95:6–22. The next day, plaintiff contacted the Local 55 union (the "Union") president Steve Splendorio and requested an executive board meeting of the Union. Plaintiff also called a special meeting of the OBFFA. On May 7, 2002, plaintiff gave two speeches (one to the OBFFA and the other to the Union) where plaintiff expressed dissatisfaction with Simon's handling of race-related problems, and related his frustration with the manner in which the Department had handled his personnel issues.[3] At the end of his speech before the Union, plaintiff asked the members to join him in a vote of "no-confidence" in Chief Simon. Russell Dec. Exh. B.

On the same day as the speeches, the Union president Steve Splendorio and OBFFA executive board member Captain Brandle called Chief Simon and informed him that plaintiff had requested a vote of no-confidence in him at a special meeting. Simon Dep. 70:18–20; 71:11–22. Soon thereafter, Chief Simon received a May 8, 2002 letter from the executive board of the OBFFA which expressed continued support for Chief Simon and stated that plaintiff "did not represent or act as a spokesperson for the OBFFA membership, and his requests, statements and conduct should be viewed as reflecting his own personal agenda." Simon Dep., Exh. 3, 69:3–12.

On or about May 17, 2002, plaintiff filed a workers' compensation claim for post traumatic stress disorder. This claim was eventually granted on December 10, 2002 and plaintiff was paid his full salary for the time he was off work. Brumfield Dep. at 122:12–123:5.

3

In addition to his workers' compensation claim, on approximately June 1, 2002 plaintiff submitted a request for Catastrophic Illness Leave. On October 29, 2002 a letter was sent by the Department to plaintiff denying his request and detailing the reasons for the denial.

Prior to plaintiff's April 17, 2002 absence, the City, and the Union began negotiations over the catastrophic leave policy as discussed in their Memorandum of Understanding (MOU). The negotiations culminated in a settlement agreement (the "Settlement Agreement") containing amendments and clarifications to the MOU that were effective retroactively to July 1, 2001. See Defendant's Request for Judicial Notice in Support of Motion for Summary Judgment (hereinafter "Req. Jud. Not."), Exh. B.

Following his request denial, plaintiff filed suit in the Superior Court of the State of California. Defendants subsequently removed the action on May 11, 2004.

Plaintiff also filed a claim with the Department of Fair Employment and Housing (DFEH) alleging a FEHA violation. On January 7, 2004, the DFEH wrote a letter to plaintiff noting that there was insufficient evidence of a FEHA violation. The DFEH noted that plaintiff's request for catastrophic leave did not make mention of a mental disability nor did it include the required medical verification of disability and projected length of absence as required by the MOU. Further, it noted that Chief Simon had the sole discretion to grant or deny a leave request and there was no evidence of a discriminatory animus. Req. Jud. Not., Exh. C. On January 21, 2004, the DFEH sent a notice of official case closure to plaintiff. Id., Exh. D.

Plaintiff alleges the following: (1) plaintiff's speeches were the motivation for Chief Simon's denial of plaintiff's leave request; (2) there was a delay in the communication of the denial decision; (3) this delay was also motivated by plaintiff's speeches; (4) plaintiff qualified for Catastrophic Leave under the MOU; and (5) the Settlement Agreement amendments to the MOU are not applicable. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

LEGAL STANDARD

Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving party's allegations.  Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).  The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion.  Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a).  "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

/////
/////
/////

5

DISCUSSION

I.     First Amendment Claims

In order for plaintiff to prevail in an action alleging retaliation in violation of the First Amendment, plaintiff must demonstrate that his speech was constitutionally protected and that the alleged misconduct was the substantial or motivating factor in the agency's employment determination. Mt. Healthy City School District Board of Educ. v. Doyle, 429 U.S. 274, 287 (1977). Defendants assert that they are entitled to summary judgment as a matter of law for plaintiff's First Amendment claims because plaintiff is unable to establish either that his speeches are constitutionally protected or that the speeches were the substantial or motivating factor for the denial of his application for catastrophic leave. Alternatively, defendants contend that they are not liable because the Department would have made the same decision absent the speeches made by plaintiff.

    A.     Protected Speech

The Supreme Court has established that the speech of government employees is protected if (1) the content, form, and context of the speech is "a matter of public concern" (see Pickering v. Board. Of Township High School Dist., 391 U.S. 563 (1968); Connick v. Myers, 461 U.S. 138, 147 (1983)) and (2) if the plaintiff's interest in expressing him or herself outweighs the interest the government has in "promoting workplace efficiency and avoiding workplace disruption." See Ceballos 361 F.3d at 1173. Under the Pickering-Connick analysis, speech that largely concerns "individual personnel disputes and grievances and . . . information [that] would be of no relevance to the public's evaluation of the performance of governmental agencies" is not protected speech for purposes of the First Amendment. Id.

Defendants contend that plaintiff's two speeches before the OBFFA and Union are not protected because they were motivated by a fear of possible termination and because their content was primarily concerned with plaintiff's own personal grievances. However, contrary to defendants' contention, plaintiff's speeches also voiced concern over the Department's response to certain racial incidents. Plaintiff began his speech with some background information regarding the postcard

incidents and what he perceived as a lack of response on the part of Chief Simon. According to plaintiff "when the postcards in question surfaced, it triggered issues inside of me that had been building regarding my profession as a firefighter . . . as time went on Chief Simon gave no information or assurances to me or the Oakland Fire Department that the threatening situation created by the postcards and vandalism was being addressed in an open and concerned manner." Russell Dec., Exh. B at 9. Further, plaintiff mentioned an alleged racial incident whereby a fellow firefighter was coerced into a vehicle by his battalion Chief and driven to railroad tracks for "an intimidating discussion." Id. at 10. In concluding his remarks, plaintiff noted that:

> I am certain that I am not the only Oakland firefighter to have been treated in this manner. I know that there are others out there that feel powerless and have no recourse or avenue to express their abuse. I have a completely new understanding of what kind of situation may have occurred to a fellow firefighter that possibly triggered the mailing of the postcards. This person obviously had no avenue of expression, except a desperate cry out through the postcards. The characterization of the Simon administration as "worse that the Klan" & "the new Third Reich" speaks volumes to me after the ordeal I have just endured.

Id. at 12–13.

Although plaintiff's speeches may have been triggered by a concern for his personal status within the force (and were indeed interspersed with comments regarding his employment difficulties, his attempts to seek mental care and his leave request), the fact remains that a significant portion of his speeches concerned the racist mail and what plaintiff perceived as a hostile environment for some of the black firefighters. Unlike in the Havekost case, upon which defendants rely, plaintiff's speech concerning racial relations in the Department, *does* contain at least a "hint of a matter of public concern." Havekost, at 318. A speech concerning the management of inflammatory racial incidents within a government agency falls squarely within the First Amendment's "public concern" requirement.

Further, under the Pickering balancing test, defendants bear the burden to demonstrate that the government's interests outweigh those of the plaintiff. Ceballos v. Garcetti, 361 F.3d 1168, 1178 (9th Cir. 2004). The "more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." Id. (quoting Hyland v. Wonder, 972 F.2d 1129, 1139 (9th Cir. 1992)). Defendants contend that plaintiff's claim that the speech is protected is a weak one because

plaintiff directed his comments to other OBFFA and Union members and not to the broader public. Although the Ninth Circuit has held that "a narrow, limited focus and a limited audience weigh against a claim of protected speech," Id. (quoting Brewster v. Bd. of Educ. of Lynwood Unified School, 149 F.3d 971 (9th Cir. 1998)) the court also held that "the private nature of the statement does not remove it from the realm of public concern altogether." Id. Indeed, the Ceballos court held that protected speech "does not lose that protection simply because the speech is directed to other employees of that governmental employer rather than to members of the public." Id. at 1174.

Assuming arguendo that plaintiff's limited audience weakens plaintiff's First Amendment interests, defendants (as in Ceballos) have made no allegations or submitted any evidence of resultant "inefficiency or office disruption." Id. at 1179 (finding that defendants had not met their burden under the Pickering balancing test absent any evidence of administrative difficulty). Thus, plaintiff's May 2002 speeches are constitutionally protected speech under the First Amendment in that to some extent they involved a matter of public concern and because defendants have not demonstrated that they have a greater interest in administrative efficiency than plaintiff has in the speech.

B.  Substantial or Motivating Factor

Although, plaintiff's two speeches are protected under the Pickering-Connick analysis, plaintiff has not met his burden of demonstrating that these two speeches were the substantial or motivating factors in the denial, or the alleged delay in the denial, of his Catastrophic Leave request. In response to defendants' motion, plaintiff has not submitted any admissible evidence but has merely submitted hearsay statements from his declaration that Chief Simon was upset with him over his speeches.[4]

(1) Alleged Delay in Providing a Written Response

First, with respect to the alleged delay, the gravamen of plaintiff's complaint is that the Department retaliated against him by sending him a written notification of the denial to his leave request after an unreasonable length of time had passed—specifically, four months after he made his

8

initial request. Plaintiff has submitted evidence that he was informed that his request was still being considered after he inquired several times into the status of his application. Brumfield Dec. ¶6, Exhs. B–D. Further, plaintiff has made note of two individuals (one whose leave request was granted and another whose request was denied) who received notification of the Department decision in an allegedly more timely fashion. Simon Dep. at 102:15–18; 107:25–108:4. However, in response, defendant has submitted evidence that one of these individuals did not receive written notification of his denial until thirteen months after his request. Id. at 98:22–25. Further, defendants allege there was no unreasonable delay. As early as mid-July, Chief Simon orally informed plaintiff's union representative of his decision (as was customary) denying the request for leave. Simon Dep. at 162:22–163:4. However, the fact that there is an August 20, 2002 letter noting that plaintiff's claim is still being evaluated undercuts this assertion by defendants. See Brumfield Dec., Exh. D.

Nonetheless, despite the fact that the alleged delay in the rendering of a decision is in dispute, there is no evidence in the record supporting plaintiff's contention that this alleged delay was in any way related to his May 2002 speeches. Aside from self-serving statements and declarations, plaintiff has submitted no evidence to suggest that his speeches before the Union and OBFFA were the substantial or motivating factor in the alleged failure of Chief Simon to respond promptly to his request.

(2) Denial of the Catastrophic Leave Request

With respect to the actual denial of the leave request, plaintiff contends that he was qualified for Catastrophic Leave and that Chief Simon impermissibly denied his request in retaliation for his speeches. In making this claim, plaintiff draws a distinction between the treatment of "non-industrial" with that of "industrial" long-term illness. According to plaintiff, pursuant to the MOU, as long as a firefighter with a "non-industrial long-term illness" exhausts all other remedies, he may make a catastrophic leave request. However, a firefighter with an "industrial long-term illness" must not only exhaust these other remedies, but his leave decision is in the "sole discretion" of the Chief of the Department. Thus, plaintiff contends, his "non-industrial" request was not in the sole

9

discretion of Chief Simon and, after purportedly qualifying for the leave, it should have been granted to him.[5]

It is true that under the express provisions of section 6.5.1 of the original MOU between the Union and the City, sole discretion is vested in the Fire Chief only for determinations that an individual with "*industrial* long term illness or injury" is eligible for catastrophic leave. Req. Jud. Not., Exh. A. Defendant contends and plaintiff disputes that despite the apparent exception of "non-industrial," the general understanding was that all Catastrophic Leave requests were in the sole discretion of Chief Simon.

Notwithstanding, the portion of the Settlement Agreement[6] that amends section 6.5 of the MOU supersedes the prior language.[7] Thus, under this agreement, which is effective as of July 1, 2001 (and as such operative at the time of plaintiff's request), Chief Simon has the "sole discretion" to determine the eligibility of an individual regardless of whether the injury or illness is industrial or non-industrial. Id., Exh. B ¶ 13. Further, in order for an individual to qualify for leave under this amended section, his illness must be "long-term and totally incapacitating or life threatening."[8]

Moreover, under plaintiff's own theory, Chief Simon's decision still finds support. Plaintiff has submitted no evidence that his injury was "life-threatening" or "totally incapacitating," but rather erroneously states that Chief Simon in his deposition testimony "agrees [that] Brumfield followed the correct procedures in requesting catastrophic leave and otherwise qualified for the C[atastrophic]L[eave]." Pl.'s Opp. at 4 ll. 21–23. The court finds that plaintiff's attempts to misconstrue the evidence is unavailing as plaintiff clearly did not qualify for the leave.[9] In denying his FEHA claim, the DFEH came to the same conclusion. Although the DFEH finding is not binding, the court independently finds that there is an absence of significant probative evidence. In the absence of any such evidence, the court concludes that Chief Simon properly denied plaintiff's request finding that plaintiff did not meet the qualifications. The court further holds that plaintiff cannot sustain his claims that 1) he was qualified for leave and 2) his leave request was denied primarily as a result of his speeches. Consequently, because of plaintiff's inability to demonstrate that his alleged injury was due in substantial part to his constitutionally protected speech, plaintiff's First Amendment claims must fail.

### C. Decision in the Absence of the Speeches

Assuming *arguendo* that plaintiff had been able to demonstrate that his speeches were a substantial or motivating factor in the denial, his First Amendment claims must still fail because the Department has "shown by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287. As aforementioned, defendants have demonstrated that plaintiff did not meet the requirements specified in the original or amended MOU for Catastrophic Leave eligibility.

## II. Section 1983 Claims

Defendants assert that they are entitled to summary judgment with respect to plaintiff's section 1983 claims because plaintiff is unable to demonstrate that defendants had a policy which operated in deliberate indifference to plaintiff's constitutional rights. Further, defendants contend, even if plaintiff was able to demonstrate the there was an official policy, qualified immunity would still bar the finding of liability. In order for a plaintiff to maintain a section 1983 claim, the plaintiff must demonstrate "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amount[ed] to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy [was] the moving force behind the constitutional violation." Oviatt v. Pierce, 954 F.2d 1470, 1474 (9th Cir. 1992).

Plaintiff's underlying First Amendment claim is untenable and thus he does not even meet Oviatt's first prong. Further, plaintiff in his papers does not address defendant's section 1983 arguments, but merely restates allegations made in his complaint with accompanying hearsay statements. Thus, absent a demonstrated constitutional right of which plaintiff has been deprived, the court grant's defendant's request for summary judgment with respect to plaintiff's section 1983 claims.

## III. Disability Discrimination Claims

Defendant asserts that plaintiff's FEHA and California constitutional claims of disability[10]

11

discrimination should also fail because plaintiff cannot establish that there was intentional discrimination. In adopting the Supreme Court's McDonnell Douglas test for employment discrimination, the Supreme Court of California has held that to make a prima facie claim of intentional discrimination, plaintiff must demonstrate that "(1) he was a member of a protected class, (2) that he was qualified for the position he sought or was performing competently in the position he had, (3) he suffered an adverse employment action, such as termination, demotion or denial of an available job, and (4) some other circumstance suggests discriminatory motive." Guz v. Bechtel Nat'l., Inc., 24 Cal. 4th 317, 355 (2000). In his complaint, plaintiff alleges that he was discriminated against (through the denial and alleged delay by the Department in rendering a decision) because of the "nature of plaintiff's disability—psychological, not physical." FAC ¶ 13. It appears that plaintiff's contention is that he faced discrimination because he had a psychological as opposed to a physical injury. Defendants contend that plaintiff is unable to meet his burden in establishing a prima facie case of discrimination because he cannot meet the second or the fourth elements above.[11]

As has been previously discussed, even assuming that plaintiff is disabled and a member of a protected class, plaintiff has still offered no admissible evidence that he was qualified for the Catastrophic Leave or that defendants' actions evidenced some discriminatory animus. Notably, the DFEH denied plaintiff's action against defendants for precisely this reason, stating that plaintiff's request for catastrophic leave did not make mention of a mental disability nor did it include the required medical verification of disability and projected length of absence as required by the MOU.[12] Although the DFEH decision is not binding, plaintiff's evidence here is no more compelling. The only evidence that plaintiff relies on is (1) the fact that his claim was denied, (2) the fact that he received a written notice of denial four months after his application and (3) the hearsay statements within his declaration, which incidentally only reference discriminatory animus with respect to his two speeches before the OBFFA and the Union. There is no evidence presented to substantiate a claim that he experienced discrimination because of his alleged disability. Consequently, plaintiff is unable to make a prima facie case of intentional discrimination and defendant's summary judgment motion is properly granted.

12

As in the case of plaintiff's First Amendment and section 1983 claims, even assuming that plaintiff was able to meet his initial burden, the Department can successfully "rebut th[is] presumption by producing admissible evidence, sufficient to raise a genuine issue of fact and to justify a judgment for the employer that its action was taken for a legitimate, non-discriminatory reason"—plaintiff's ineligibility under the express provisions of the MOU for Catastrophic Leave. Guz, 24 Cal. 4th at 355–6 (internal quotations and citations omitted).

IV.   Tort Damages Claim

Defendants asserts that plaintiff's claims for intentional infliction of emotional distress and negligence cannot be sustained against the City or the Department because they are not based upon statute, but rather on common law. In Cochran v. Herzog Engraving Co., 155 Cal. App. 3d 405 (1984), the California Court of Appeal held that California Government Code section 815 had "abolished all common law or judicially declared forms of liability for public entities, except for such liability as may be required by the federal or state Constitution." Id., at 409. Consequently, "*all* government tort liability *must* be based on a statute." Id. (emphasis added)

In the case at hand, plaintiff has not "specifically allege[d] . . .[an] applicable statute or regulation" which raises a duty on the part of defendants. Brenneman, 208 Cal. App. 3d at 817. Absent an enabling statute, plaintiff cannot sustain a negligence or an intentional infliction of emotional distress claim against any of the defendants. It is worth noting that plaintiff has not submitted any evidence whatsoever in support of his claim that Chief Simon intended to cause plaintiff harm.

Consequently, the court grants defendant's request for summary judgment with regard to plaintiff's tort claims against all defendants.

V.   Conspiracy Claim

Plaintiff contends that there was a conspiracy between the defendants to harm and injure plaintiff. However, plaintiff's conspiracy claim is untenable absent an underlying constitutional or statutory violation. Thus, given the foregoing, summary judgment with respect to this claim is

13

proper.

VI.     Punitive Damages Claim

Given the foregoing, plaintiff's claim for damages is moot and summary judgment is proper.

VII.    Summary

Defendants are entitled to summary judgment on all the claims asserted by plaintiff in his complaint as there is no genuine dispute over a material fact. Plaintiff cannot establish his claims of discrimination under the First Amendment, section 1983 or FEHA. Plaintiff is also unable to demonstrate that defendants engaged in tortious conduct or were involved in a conspiracy to harm plaintiff. Absent recovery under any underlying claims, plaintiff's claim for punitive damages is moot.

CONCLUSION

For the foregoing reasons, the court GRANTS defendants' motion for summary judgment.

IT IS SO ORDERED

Dated: February 3, 2006

*(signature)*

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

ENDNOTES

1. Unless otherwise noted, all facts are taken from plaintiff's first amended complaint (the "complaint" or "FAC").

2. The court sustains defendants objections to plaintiff's statements in his declaration characterizing the mailing as derisive of the OBFFA. The only postcard in the record is derisive of Chief Simon. Brumfield Dec., Exh. A.

3. The court overrules defendant's second objection as plaintiff's comments were highly critical of Chief Simon's management of the racial incidents and they did reference a hostile work environment.

4. The court sustains defendants fourth and fifth objections to plaintiff's statements with respect to Chief Simon's motivations.

5. Essentially, plaintiff contends that since Chief Simon initially *believed* that plaintiff's injury was "non-industrial", plaintiff was thus discriminated against on that basis. However, plaintiff's injury was "industrial" and plaintiff cannot recover under the notion of a hypothetical right to receive catastrophic leave for a type of injury he did not even possess.

6. Plaintiff's contentions that the settlement agreement process was itself initiated to sandbag him is similarly unsupported as it is merely an assertion in plaintiff's papers, offered with no evidentiary basis. The settlement agreement process was initiated before plaintiff even made his leave request.

7. Pursuant to the Settlement Agreement, "any and all disputes" relating to inter alia the "interpretation and/or application of section 6.5 of the MOU" are settled. Req. Jud. Not., Exh B at 1, 2. Under Mahon v. N.L.R.B, 808 F.2d 1342 (9th Cir. 1987), a labor union may settle claims arising out of any dispute on behalf of their members, without obtaining the individual consents of each union member.

8. According to defendants, these two requirement were customary and the point of contention between the Union and the Department was rather whether the Catastrophic leave requirements should be drafted to read "totally incapacitating *or* life threatening" or "totally incapacitating *and* life threatening."

9. The court sustains defendants third objection to plaintiff's statements that he was "guaranteed" leave under the MOU.

10. Cal. Govt. Code section 12940 states in relevant part that "[i]t shall be an unlawful employment practice . . . (a) for an employer because of . . . mental disability . . .[to] discriminate against the person in compensation or in terms, conditions or privileges of employment."

11. In their papers defendants note that plaintiff cannot meet the second and third elements of his *prima facie* case. Presumably defendants had intended to allege that plaintiff is unable to meet the

15

second and the *fourth* elements as it is undisputed that plaintiff's request for catastrophic leave was denied.

12.  Although the Department did not rely upon these procedural defects in denying plaintiff's leave request, defendants still found that plaintiff did not meet the substantive requirements for catastrophic leave.